In the
United States Court of Appeals
For the Seventh Circuit

No. 97-4192

JAMES E. FULLER,

Petitioner-Appellant,

v.

LINDA A. DILLON, PATTI WILSON, JOHN ZIELINSKI,
DOCTOR VALLABHANENI and DOCTOR VIDAL,

Respondents-Appellees.


Appeal from the United States District Court
for the Southern District of Illinois
No. 94 C 92--James L. Foreman, Judge.


Argued October 25, 2000--Decided January 10, 2001


  Before COFFEY, DIANE P. WOOD, and WILLIAMS, Circuit
Judges.

  Coffey, Circuit Judge.  On January 7, 1994, James
Fuller, an inmate formally confined at Menard
Psychiatric Center (MPC),/1 filed suit under 42
U.S.C. sec. 1983 alleging that he was wrongfully
administered psychotropic medication against his
will. Specifically, Fuller claimed that his due
process rights were violated because the decision
to medicate him against his will was not
accompanied by adequate procedural protections as
required by the United States Constitution./2
Fuller sought $1.5 million and a transfer to a
medium or minimum security prison. The district
court granted summary judgment in favor of the
defendants/3 on qualified immunity grounds. The
judge also concluded that defendants Dillon and
Wilson were entitled to summary judgment because
of their lack of personal involvement in the
decision to medicate Fuller. The judge denied
Fuller's request for injunctive relief as moot.
We affirm.

I.   BACKGROUND
A.   Fuller's Forced Medication

  On August 5, 1992, Fuller was placed at MPC
because he had attempted to set himself on fire
and was experiencing auditory hallucinations./4
Dr. Vallabhaneni, the psychiatrist who treated

Fuller at MPC, found that Fuller was "suffering from a serious mental illness with a diagnosis of delusional disorder, paranoid, with a differential diagnosis of paranoid schizophrenia." In October 1992, Fuller was once again transferred to MPC "due to paranoid delusions that he was being poisoned, presenting himself in an inappropriate fashion by remaining undressed, experiencing auditory hallucinations, and attempt (sic) to burn himself alive by putting a sheet over his head and lighting it."/5

On February 18, 1993, after Fuller refused to voluntarily take psychotropic medication, Dr. Vallabhaneni wrote to the Treatment Review Committee recommending that Fuller be involuntarily medicated with psychotropic medication because Fuller was "becoming very paranoid," "gravely disabled," and "likely to . . . pose harm to self or others." According to Dr. Vallabhaneni, the forced psychotropic medication "may help [Fuller] relieve his paranoid delusions."

On February 22, 1993, the Treatment Review Committee, consisting of defendants Zielinski and Dr. Vidal, met to review Dr. Vallabhaneni's forced medication recommendation. At the February 22nd hearing, Fuller "presented himself to the Committee in a very polite and appropriate fashion" and challenged Dr. Vallabhaneni's recommendation to force him to undergo psychotropic medication on the grounds that the doctor did not speak with him for more than five minutes on any one occasion and that sometimes Dr. Vallabhaneni was unable to remember Fuller's name. Fuller further argued, incorrectly, that he had no history of violent episodes (he twice tried to kill himself by lighting himself on fire (once by putting a sheet over his head and lighting it)). Finally, Fuller explained that his opinion that Dr. Vallabhaneni was the Anti-Christ was only a religious belief and that such beliefs did not harm any one.

The Committee concluded that Fuller had no insight into his mental illness nor into his need for medication. The administration of enforced medication is without doubt in the inmate's best interests. Without the medication the inmate will continue to deteriorate. It is believed that a substantial risk exists that physical harm will be inflicted by the inmate upon himself and/or others as has been evidenced by his behavior during his psychotic episodes.

* * *

Though the inmate is not displaying any florid

symptoms of psychosis at this point, his letters clearly indicate that he is delusional and paranoid and somewhat agitated in his beliefs. It is thus believed that such symptoms are prodromal to his deteriorating to a more severe state.

   After the Committee approved Dr. Vallabhaneni's decision, Fuller was forcibly administered psychotropic medication, and although he filed a written appeal to Dr. Shansky, the Illinois Department of Corrections Medical Director, no written decision by Dr. Shansky was ever produced./6

B. Illinois' Forced Administration of Psychotropic Medication

   If prison officials in the State of Illinois determine that an inmate is in need of forced psychotropic medication, prison medical staff must follow the guidelines set forth in the Illinois Administrative Code. Pursuant to Ill. Admin. Code 20 sec. 415.70 (2000), prison officials may administer psychotropic medication as follows:

a) Administration of Psychotropic Medication

1) Psychotropic medication shall not be administered to any committed person against his or her will or without the consent of the parent or guardian of a minor who is under the age of 18 and confined in the Juvenile Division, unless:

   A) A psychiatrist, or in the absence of a psychiatrist a physician, has determined that:

     i) The committed person suffers from a mental illness or mental disorder; and

     ii)  The medication is in the medical interest of the committed person; and
     iii)  The committed person is either gravely disabled or poses a likelihood of serious harm to self or others; and

   B) The administration of such medication has been approved by the Treatment Review Committee after a hearing (see subsection (b) of this Section).

* * *

b) Treatment Review Committee Procedures

   The Treatment Review Committee shall be comprised of two members appointed by the Chief Administrative Officer, both of whom shall be mental health professionals and one of whom shall be a physician. One member shall serve as

Chairperson of the Committee. Neither of the Committee members may be involved in the current decision to order the medication. The members of the Committee shall have completed a training program in the procedural and mental health issues involved which has been approved by the Agency Medical Director.

* * *

c) Review by Agency Medical Director

1) If the committed person appeals the Treatment Review Committee's decision, staff shall continue to administer the medication as ordered by the physician and approved by the Committee while awaiting the Agency Medical Director's decision on the appeal.

The following series of events must occur, under the Illinois Administrative Code, before prison officials are authorized to administer psychotropic medication against an inmate's will. Initially, a psychiatrist or physician must conclude that: 1) the inmate was suffering from a mental illness or mental disorder; 2) the medication is in the prisoner's medical interest; and 3) the inmate is either gravely disabled or poses a likelihood of serious harm to self or others. Ill. Admin. Code 20 sec. 415.70(a)(1)(A)(i)-(iii). Second, the inmate, under Ill. Admin. Code 20 sec. 415.70(a) (1)(B), is entitled to a second level of review of the decision to forcibly medicate him in the form a hearing before the Treatment Review Committee, comprised of two mental health professionals (one of which must be a physician). Ill. Admin. Code 20 sec. 415.70(b). If the Committee agrees with the treating doctor, the inmate is immediately subjected to forced medication. However, after forced medication has started, the inmate-patient is entitled to a third level of review under Illinois law; within five days, the inmate may appeal the decision to forcibly medicate him to the Medical Director of the Illinois Department of Corrections. Ill. Admin. Code 20 sec. 415.70(c) et seq.

II. ANALYSIS
A. The Decision to Forcibly Mediate Fuller

On appeal, Fuller argues that the decision to forcibly medicate him violated his due process rights for two reasons. Initially, he alleges that Illinois' procedure for forced medication is facially unconstitutional because, according to Fuller, it does not provide for administrative review until after the medication has been administered. The second claim Fuller makes is that prison officials violated his due process

rights by failing to follow Illinois state procedure before medicating him.

### 1. Whether Illinois Requires Administrative Review

Fuller's first claim, that Illinois does not require administrative review before a prisoner is forcibly medicated, is based on his faulty premise that the initial decision to medicate him came from the Treatment Review Committee. However, as section 415.70 and the record clearly establish, the initial decision to medicate Fuller was made by his treating psychiatrist, Dr. Vallabhaneni, and not by the Treatment Review Committee.

On February 18, 1993, Dr. Vallabhaneni wrote to the Chairman of the Treatment Review Committee and stated that, after examination and treatment, he had found Fuller to be in need of psychotropic medication on an involuntary basis because he: 1) had become very paranoid; 2) remained seclusive and suspicious; 3) posed a likely threat of harm to self or others; and 4) was gravely disabled. Dr. Vallabhaneni also wrote that Fuller was suffering from delusional disorder and that medication was in Fuller's best interest because it may "help him relieve his paranoid delusion." Thus, the record clearly establishes that Dr. Vallabhaneni was the individual who was responsible for the initial decision to medicate and not, as Fuller would have us conclude, the Treatment Review Committee./7 We are convinced that Dr. Vallabhaneni's letter to the Committee complied with the requirements of section 415.70. Fuller's argument that the decision to medicate him was unconstitutional because there was no administrative review is without merit because the Treatment Review Committee did, in fact, review and approve Dr. Vallabhaneni's decision to medicate Fuller.

### 2. The Third Level Of Review

On appeal, Fuller also argues that the district court's grant of summary judgment to the defendants was improper because Dr. Shansky failed to issue a decision with regard to Fuller's forced medication. Fuller argues that Dr. Shansky's failure rendered the decision to forcibly medicate him a violation of the United States Constitution. As stated earlier in the opinion, Dr. Shansky, upon Fuller's appeal to him, was to provide another level of review by reviewing the Treatment Review Committee's approval of Dr. Vallabhaneni's decision to medicate Fuller. However, Dr. Shansky failed to issue a decision as to whether Fuller needed

psychotropic medication. Fuller argues that this amounted to a violation of his due process rights.

Initially, it is important to note that the failure of the prison officials to follow state administrative rules is not a denial, in and of itself, of one's due process rights. Osteen v. Henley, 13 F.3d 221, 225 (7th Cir. 1993); see also Gilmore v. Taylor, 508 U.S. 333 (1993); Estelle v. McGuire, 502 U.S. 62 (1991). It is also important to understand that when reviewing decisions based on qualified immunity, we must determine whether the defendant's actions were objectively reasonable in light of the clearly established law at the time of their actions. Conn v. Gabbert, 119 S. Ct. 1292, 1295 (1999); Harlow v. Fitzgerald, 457 U.S. 800, 812 (1982). Thus, in this case, we must determine whether a reasonable prison official could have believed that, when taking into account all the circumstances regarding Fuller's case history including his previous psychiatric examinations and treatment, it was proper to medicate Fuller against his will without a decision from Dr. Shansky. Anderson v. Creighton, 483 U.S. 635, 639-41 (1987).

In Sullivan v. Flannigan, 8 F.3d 591 (7th Cir. 1993), this court examined the State of Illinois' forced medication regulations in light of the Supreme Court's decision in Washington v. Harper, 494 U.S. 210 (1990). In Sullivan, 8 F.3d at 598, this court stated that:

Harper emphasized several aspects of an inmate's right to refuse drug treatment. First, to administer involuntary treatment the state must find that medication is in the prisoner's medical interest (independent of institutional concerns). 494 U.S. at 227, 110 S. Ct. at 1039. Second, the tribunal or panel that reviews a treating physician's decision to prescribe forced medication must exercise impartial and independent judgment, taking account of the inmate's best interest. Id. at 222, 233, 110 S. Ct. at 1036, 1042; compare id. at 250-53, 110 S. Ct. at 1051-53 (Stevens, J., dissenting). Third, the prisoner must be able to argue capably before a review tribunal that he does not need forced medication. Id. at 233, 110 S. Ct. at 1042. If the state failed to meet these requirements in a particular case, the prisoner could argue that he was denied Harper's protections.

As in Sullivan, all three requirements of Harper were complied with in this case.

First, both Dr. Vallabhaneni and the Treatment Review Committee opined that the decision to

forcibly medicate Fuller was in his best interest. In fact, we neither read the briefs nor the record in this case to suggest that anyone, besides Fuller, even contends that the decision to medicate Fuller was not in his best interest. Nor do we believe that such an argument could be made. Initially, Fuller fantasized and believed Dr. Vallabhaneni to be the Anti-Christ. Additionally, he, according to the Treatment Review Committee's notes, previously tried to escape from prison based on instructions from Satan. Furthermore, Fuller thought he was being poisoned, experienced auditory hallucinations, and tried to kill himself on two occasions by lighting himself on fire. We are of the opinion that Dr. Vallabhaneni and the Committee acted well within their discretion in concluding that Fuller was suffering from a mental illness and in need of forced medication. Because Fuller refused to take medicine voluntarily, authorities, in order to protect him, other inmates, and MPC personnel and property, were forced, with the approval of the Treatment Review Committee, to administer psychotropic medication.

Under Harper and Sullivan, there must also be an independent tribunal that evaluates the decision to forcibly medicate a prisoner. In this case, the Treatment Review Committee satisfied this requirement. The Committee, comprised of Zielinski and Dr. Vidal, met and reviewed Dr. Vallabhaneni's decision to medicate Fuller./8 The Committee's written decision evidences a thorough understanding of the issues in the case and also that it was fully apprised of Dr. Vallabhaneni's diagnosis, Fuller's arguments, as well as Fuller's psychiatric history. We are of the opinion that the Committee exercised "impartial and independent judgment" and took Fuller's "best interest" into account when deciding to approve the decision to forcibly medicate Fuller.

Finally, the third factor that the state must satisfy before attempting to forcibly medicate an inmate is to allow the prisoner the opportunity "to argue capably before a review tribunal that he does not need forced medication." Sullivan, 8 F.3d at 598. According to the Treatment Review Committee, Fuller was given the opportunity at the time of his hearing in front of the Committee. At that time, Fuller "presented himself to the Committee in a very polite and appropriate fashion" and was aided by Staff Assistant Larry Whittenburg. Furthermore,

[i]nmate Fuller challenged the doctor's decision to place him on enforced medications claiming that the doctor does not speak to him for more than five minutes and on occasion doesn't even

know his name. He also claimed that the doctor's allegations that he is seclusive, is deteriorating, and is in danger of hurting himself and others is not valid. He states that he maintains contact with his family and that he is not deteriorating and that he is not demonstrating any suicidal or aggressive behaviors. He states that if he is suspicious it is only that he is suspicious of Dr. Vallabhaneni. Inmate Fuller stated that he was in Segregation because he was cited for escape because he was in an area he was not supposed to be. He also explained that he was transferred to Menard Psychiatric Center because he had bugged up and that he had made some attempts to kill himself. Inmate Fuller requested that Sgt. Spiller be contacted as a witness to testify that he has been behaving himself while in Segregation. Upon question about the letter that had been sent to Dr. Vallabhaneni (calling him the Ant-Christ), inmate Fuller explained that those were just his religious beliefs and that such beliefs harm no one.

The fact that the Treatment Review Committee did not agree with Fuller's arguments and ultimately approved the decision to forcibly medicate Fuller, does not change the fact that the State of Illinois provided Fuller with an opportunity to "argue capably" that forced medication was unnecessary. Furthermore, the fact that Fuller was lucid at the time of the hearing does not call into question the fact that psychotropic medication is an effective means of controlling one's violent thoughts and actions, and it is well-accepted that psychotic people often have lucid moments for significant periods of time. See, e.g., Paul F. Stavis, The Nexum: a Modest Proposal for Self-guardianship by Contract: a System of Advance Directives and Surrogate Committees-at-large for the Intermittently Mentally Ill, 16 Journal of Contemporary Health Law and Policy 1 (1999); Robert C. Schwartz, Symptomatology and Insight in Schizophrenia, 82 Psychological Reports 227 (1998).

We are of the opinion that the prison officials followed the mandate of Harper and Sullivan before proceeding to medicate Fuller without his consent. Nothing in the Constitution, Supreme Court caselaw, or other federal court caselaw suggests that Fuller was constitutionally entitled to a third level of review from Dr. Shansky before he was forcibly medicated. We agree with the trial judge and conclude that the defendants are entitled to qualified immunity regardless of the fact that Dr. Shansky failed to issue a decision regarding Fuller's appeal./9

B.  Injunctive Relief

In addition to the $1.5 million in damages Fuller requested, he also sought injunctive relief in the form of a transfer to a medium or minimum security prison. The trial judge denied Fuller's request for injunctive relief as moot because Fuller was no longer housed at MPC and had not been subjected to forced medication since July 20, 1995. We agree with the decision of the trial judge because Fuller has already received the injunctive relief he requested--a transfer to another prison. According to Fuller's affidavit, he was transferred from MPC to MCC on July 20, 1995. Furthermore, as of July 20, 1995, Fuller admits that he has not been forcibly medicated. Finally, and although we certainly do not condone the fact that Dr. Shansky never issued a decision with regard to Fuller's appeal, we are of the opinion that the defendants substantially complied with the due process clause before medicating Fuller and that it is unlikely that if Fuller was once again subjected to forced medication (he admits that he has not been for over five years) that his appeal to the Medical Director of the Illinois Department of Corrections would be lost.

The decision of the district court is

AFFIRMED.

/1 Fuller is now housed at Menard Correctional Center (MCC).

/2 Fuller also claimed that his eighth amendment rights were violated because the decision to forcibly medicate him against his will constituted cruel and unusual punishment. On appeal, Fuller has dropped this argument.

/3 Fuller's complaint named as defendants: 1) Linda Dillon, former warden of MPC; 2) Patricia Wilson, former assistant warden and current warden of MPC; 3) John Zielinski, the Clinical Services Supervisor at MPC; 4) Dr. David Vidal, the Medical Director of MPC; and 5) Dr. N. Vallabhaneni, Fuller's treating psychiatrist at MPC.

/4 Although the record is less than clear, it appears that Fuller was originally transferred to MPC on August 5, 1992, from Pontiac Correctional Center (PCC) where he was serving a criminal sentence. Whether Fuller was transferred from PCC or MCC on October 31, 1992, is also unclear from the record. According to the Treatment Review Committee, Fuller was also originally transferred from PCC because he was caught trying to escape and told the prison psychiatrist that the devil told him to do it.

/5 At some point not disclosed in the record, Fuller wrote a letter to Vallabhaneni and called him the "Anti-Christ."

/6 The State of Illinois admits in their brief that "there exists nothing in the record to suggest an explanation for the absence" of any decision from Dr. Shansky.

/7 We note that even the name "Treatment Review Committee" suggests that the initial decision was made elsewhere because the Committee, by its very name, is reviewing treatment recommendations.

/8 While the review committee in Harper consisted of three members (one of which was a psychiatrist), we do not read Harper as mandating a constitutional minimum for the specific number of people that must sit on the panel nor who must sit on the committee. We think it is enough that the panel consisted of two members who were required to be mental health professionals under Ill. Admin. Code 20 sec. 415.20(i), with one being a physician. Ill. Admin. Code 20 sec. 415.70(b).

/9 Because each of the defendants are entitled to the entry of summary judgment in their favor on the grounds of qualified immunity, we need not review the judge's alternative finding that defendants Dillon and Wilson were entitled to summary judgment on the ground that they lack any personal involvement in the decision to medicate Fuller.

Diane P. Wood, Circuit Judge, with whom Williams, Circuit Judge, joins, concurring. I agree with much of what the majority has written in this case, including most importantly its conclusion that the defendants were entitled to qualified immunity from suit on Fuller's claims for damages and its conclusion that any claims for injunctive relief he is still raising are moot. I write only to note that I understand the discussion of the merits of Illinois's system for administering forced medication to a prisoner as something directed to the question whether the state officials must have known that without a second level of independent review their system was clearly unconstitutional. As the majority's discussion illustrates, there is much that appears quite reasonable in the system the state has adopted, and thus there is no way Fuller can overcome the claim of qualified immunity from

suit. See, e.g., Anderson v. Creighton, 483 U.S. 635, 639 (1987); May v. Sheahan, 226 F.3d 876, 881 (7th Cir. 2000). Because our decision rests on qualified immunity, however, I do not read it as a final conclusion on the constitutionality of Illinois's system in the absence of review by the Agency Medical Director. The district court did not rest its decision on that ground, and there is no need for us to do so either. It is enough to say that we agree with the district court that qualified immunity is surely present on these particular facts, and leave other possible cases for another day.